I will speak as loudly as I can. Thank you. I've got five daughters, so I know they can talk louder. I have a loud speaking voice, so I'll be more than happy to speak up. Thank you. Defendant Charles Jagie testified that on January 9, 2004, he was working as a journeyman carpenter at a job for ALCA Carpentry. In the morning of that day, he was cutting jack rafters, which were wood components for the roof of a house, on the ground with a 7 1⁄4 circular saw when he accidentally severed his left ring and middle finger with the saw. He testified that upon realizing that he severed his fingers, he grabbed the saw with his right hand and threw it 10 feet. He immediately treated at Rush-Copley Hospital, and he was told at that time that they couldn't reattach either of the fingers,  and so they referred him over to Central DuPage Hospital, where he treated with Dr. Kiesler. Dr. Kiesler also stated he was unable to reattach his ring finger, but thereafter performed a procedure to reattach the middle finger. Defendant continued to treat with Dr. Kiesler after the surgery, and as of January 16, 2004, he began to complain of right shoulder pain. Defendant was referred to Dr. Watt for treatment for the right shoulder on April 1, 2004, and did not return for any additional shoulder treatment after that date with Dr. Watt. On June 17, 2004, defendant underwent an EMG-NCV with Dr. Norick, which revealed upper brachial plexus stretch injury. Defendant returned to work for plaintiff on July 7, 2004, with restrictions of 25 pounds lifting with the left hand and no working in temperatures under 40 degrees. Plaintiff accommodated those restrictions, and defendant was hired back as a trim carpenter at the union-scale rate for a journeyman carpenter. He worked full-time in this capacity until he underwent surgery to his left middle finger on February 3, 2005. He was then off work again until April 11, 2005. He thereafter returned to ALCA, plaintiff, with the same restrictions, the 25 pounds lifting with the left hand and no working in temperatures under 40 degrees. He worked again full-time until July 19, 2005. On July 19, 2005, defendant was given additional restrictions due to an unrelated cubital tunnel injury, and those additional restrictions were 5 pounds lifting with the left hand, along with he could not have any activities on ladders that were over 6 feet. Counsel, you're contesting that the commission's decision that claimant sustained right shoulder injuries arising out of and in the course of his employment on January 9, 2004 was against the manifest weight of the evidence. Is that correct? That is correct. Why is it finding against the manifest weight of the evidence? Well, the reason that we are arguing that it's against the manifest weight of the evidence is due to the fact that after Petitioner, while Petitioner was treating at Central DuPage Hospital, there are I think about 50 to 100 pages of records with very detailed nurse's notes, which don't state anything during his stay there. And I believe he was there from between 5 to 7 days, because he had the surgery and then he was in the hospital inpatient for a couple days after that. And there was no notations whatsoever of any right shoulder pain at that time. There's no medical record supporting the finding that the claimant began reporting shoulder pain while he was hospitalized following the surgery to reattach his finger? No. What happened was Dr. Kiesler stated in one of his records, and then he stated also upon deposition, that during postoperative convalescence, Mr. Jagie began complaining of right shoulder pain. However, if you look at all of the records, and I have looked at every single record from treatment at Central DuPage Hospital while he was there, there is not one notation regarding Petitioner noting that there was any pain. Petitioner even stated in subsequent records that he was in so much pain while he was at the hospital that he couldn't sleep. Now, it's interesting to me that Petitioner was unable to sleep, and they didn't make a notation of this. However, there is notations in the nursing notes of the fact that he had nausea one day and that he had difficulty digesting different medications that he was taking. But for some reason, the fact that even though he was unable to sleep due to his right shoulder pain, allegedly, there is no notations whatsoever. Now, what about the opinions of Dr. Watt, Eilers, and Tonino, that each causally connected the claimant's shoulder injury to his work accident? Did the Commission just discount that? Well, no. Basically, the thing is, is that both, okay, Dr. Watt, for example, Dr. Watt stated that not one of these different, the doctors that you specifically just stated, not one of them stated they could for sure causally connect that accident, the injury to his right shoulder, that accident. In fact, the majority of them said that it was undetermined. They said that they weren't able to causally connect it. They said it possibly could be, but there was also a great deal of contradiction between the different doctors as to what caused it. There was, for example. Well, isn't that really the function of the Commission? I mean, if this is all just about bringing a doctor and get a doctor's opinion and that's the end of the story, what's the Commission supposed to be doing? Isn't it the fact finder? Isn't it supposed to look at the evidence presented to it and then conclude what is the causation? Yes, Your Honor. I mean, we don't give up our jurisdiction as a Commission to a doctor. You have his testimony. Was he found to be incredible? Did the arbitrator find him to be credible and the Commission confirm? Yes. However, but the reason that we've appealed it to this level is because we disagree with the conclusion that the Commission came to, and we believe that the manifest weight of the evidence proves. And what do you have to show to overturn? What I have to show is the fact that Dr. Kiesler, defendant's treater. You have to show the opposite conclusion is clearly apparent. What's so clearly apparent? And I'm going to get to that. Dr. Kiesler, defendant's treater, stated in the records and at his deposition that he was uncertain as to the cause of defendant's right shoulder injury. When he asked about the jerking of the saw, whether that could have been a causative factor, he said, possibly. What did Dr. Tonino say? Dr. Tonino is the only, he is an expert, and he is the only doctor, and in this case in which he said that there was a causative relationship. He opined there's causal connection. However, there are four other doctors who stated that they were uncertain. They couldn't put their finger on it. Does that mean, so four of them are uncertain, one of them certain. Why is it against the manifest weight of the evidence? Because the documented uncertainty of the other doctors is large. I mean, they basically say, we can't tell you. How is it that four different doctors can say, I really can't tell you how this is possibly causing his injury? One of them says, well, I think it had to be because, you know, his injury was possibly caused by the fact that he jerked the saw. But think about what you're saying. Yes. In order for the finding to be against the manifest weight of the evidence, an opposite conclusion would clearly have to be apparent. So you've just framed it. You've got one positive, Dr. Tonino, causally connecting it by your own admission. Yes. You've got four neutral opinions, if you want to put that spin on it, and the commission finds in favor of the claim. So where is the opposite conclusion? What are you basing your opinion, the opposite conclusion, as apparent? I guess what I'm saying is that the majority, the vast majority, four out of five doctors are stating not necessarily that they're moderate about it. They're saying, we don't know. We can't tell you anything. So if you cancel all those out and you have one positive, the commission believes the positive, where does that leave you? Well, we have one Dr. Sederman, who is the plaintiff's expert, stating that it wasn't causally related. And they could disbelieve him, right? I'm sorry? The commission could disbelieve him, couldn't they? Yes. If we have those four doctors and just line them up in a row, we have one doctor that says it's possible. We have one doctor that says it's possible. We have one doctor that says it's not possible. And then we have two or three who say, eh, I don't know. They don't even say possible. No. They say it's possible, but they say, I can't tell you. The etiology is an argument. They can't give a reasonable degree of medical certainty. They can't line it up that this is the cause of this effect. Right. They can't say for sure. But they say. They say it's more probably than not. Most of them are just saying, we don't know. Is there a possibility that that could be the reason? That the jerking of the saw could be the reason? Who is the one that's only going to decide whether it's more probably than not? Well, I guess this Court. No, we review the body that decides whether it's more probably than not. And that body is the? Commission. Commission. But I guess. It's not. We may disagree. I understand. We may have an opposite view. But. Yes. We are bound by that review standard. And I understand that. I guess the reason that we bring it to this Court's attention, as I said previously, is because I believe that the manifest weight is, you know, of the evidence, does actually show that there wasn't a definite proving of causal relationship in this case. Okay. Well, I think we have to admire your fortitude on that issue. What about the wage differential? And that's my second and larger issue. Established in Galeanetti v. Industrial Commission, two elements must be proved at trial to qualify for a wage differential benefit. The first one, partial incapacity, which prevents him from pursuing his usual and customary line of employment. Second one being an impairment of earnings. Okay. With regard to partial incapacity, not one treating physician or expert in the notes or during his deposition stated his or, I should say, just his, that defendant cannot, cannot, is unable to return to work as a carpenter. Dr. Eilers stated in his deposition that he will be able to return to work. Dr. Watt testified that upon hearing that defendant had been working full duty as a carpenter, he should be able to continue working in that capacity. So the arbitrator is wrong when he says he relies upon the vocational counselor, Mr. Fisher, and the opinions of Dr. Kiesler, Dr. Tonino, and Dr. Eilers. He's wrong? Well, the arbitrator is not wrong in that they rely on those opinions. However, the arbitrator's decision based upon those opinions, I believe, was against the manifest weight of the evidence. And that is why? And the reason for that is because all of those doctors stated that he could return to work as a carpenter. Dr. Eilers, Dr. Watt, Dr. Kiesler, all state he can return to work back as a carpenter. Dr. Fisher, the voc expert, states that he can return to work as a carpenter. Now, he does say in a selective job placement. However, at the same time, still a carpenter. I have difficulty understanding the employer. He made his weekly income as a journeyman carpenter was $1,450 a week. I know it was $36.25 an hour. That sounds about right, yeah. Well, and under the selective work that he's now doing, it's $920 a week. However, he was offered selective work, if you want to call it that, but it was carpentry work by ALCA, the plaintiff, for the journeyman wage he was receiving prior to the injury or whatever he. How many hours a day? Was it the same? Was it eight hours a day? That's what he was working up to the time that he was discharged. Is that what they offered him, work for the journeyman carpenter? Yeah, full-time work. Full-time work. And he was offered this. Not only was he offered this. What happened was in, let's see, July 19th of 2005, he was given additional restrictions that I had mentioned previously. Therefore, the lifting with his left hand went from 25-pound restriction to 5-pound restriction, and then he also was given the additional restriction of no use of a ladder above 6 feet. And what happened was when he was given that restriction, which is unrelated to this case, they were unable to accommodate his restrictions anymore. Once this was lifted on August 3rd, 2005, and subsequent to Mr. Jeky receiving his job at Step 1 Stairways, which is his job subsequent to his job with plaintiff, he was offered job again by ALCA as soon as that additional restriction was lifted. He refused. Counsel, your time is up. You'll have time in rebuttal. Okay, thank you. Counsel, please. May it please the Court. Good morning, Your Honors. My name is Tommy Stroud on behalf of the Petitioner, and I will refer to them as Petitioner and Respondent respectfully today. Your Honors, the Commission's decision on both issues were not against the manifest weight of the evidence. I'll begin. I don't think you should waste a lot of time on the question of causation, but talk to us about the wage differential. Okay. I'll start with the wage differential then. A couple of things that opposing counsel did not point out. First of all, you have somebody that has this restriction of the 25 pounds on the left hand and no working under 40 degrees outside. In addition, after they made this recommendation or offer for him to come back to this alleged full duty, they had Petitioner evaluated by Dr. Tonino in October 2005, and that's when he put a restriction on the right shoulder upper extremity, as well as having no lifting over 10 pounds on that, in addition to no overhead lifting or repetitive use. So you have an additional thing that occurred after they made that offer. But the argument had been, even taking the right shoulder out of the equation, that if you look at the restrictions that he had, 25 pounds and the no working outside under 40 degrees, that he legitimately was not going to be able to do what was expected as a journeyman carpenter. And Mr. Cardot, his supervisor at ELCA, testified at trial that you expect a journeyman carpenter for a journeyman's wages. He was not back working the full duty that he was doing prior to this accident. They had him doing trim carpentry work, which was something completely different and very, I mean, different activities than he was doing before. He could not do the kind of 100 pound lifting in full outside during the winter carpentry work he was able to do. And when Your Honor asked, was he working eight hours a day during this time when they made that job offer, prior to this, I think this is clear in the record, ELCA acknowledged that he was, even though he technically was there eight hours a day, he was only doing six hours worth of production. So they acknowledged that he had lost two hours worth of production during the day. And their response is, well, you know what, we like the guy so much, we're just going to let him keep working and pay him for eight hours a day, even though he's doing six hours worth of work. And that's where our argument came in, you know, contrary to that. I mean, realistically, if the point of a wage impairment is to say that this gentleman is going to have a loss in earning capacity, aside from this one special magic employer who apparently is willing to employ somebody doing six hours worth of work in an eight-hour day, who just happened to be the employer he got injured at, is another company out there that's going to take a carpenter for union's wages at $36.25 an hour, going to be able to have work for this gentleman that he can't do any lifting with 25 pounds in the left hand, can't even be outside during the winter under 40 degrees. And in addition, Dr. Tonino has this restriction of 10 pounds, again, no overhead use and no repetitive motion. So when you take those things together, again, as your Honors acknowledged, this is a manifest weight standard. When you consider all of the evidence, I don't see that the opposite result here is clearly apparent. We proved the first prong of the wage impairment, that he does have a diminished capacity. He clearly cannot be a journeyman carpenter. And we had, you know, opposing counsel says no doctor said that he can't be a carpenter. But again, you're talking about restricted carpentry. It's not the full-duty position that he was accustomed to doing. And what the doctors did do is give him restrictions. And we had him evaluated by the vocational counselor, said that within those restrictions, he is not going to be able to do the full duties of a journeyman carpenter. Was he offered that position, though, as a journeyman carpenter? I understand the argument about the restrictions. Did the company offer him a position as a journeyman carpenter, making the same wages as he made before? Your Honor, they offered him a job. The only, I guess, dispute I would take with the way you phrased that is they did not offer him a true journeyman carpenter position. What they said is he could do trim work and, again, do six hours' worth of work during an eight-hour day. That's what they allowed him to do. They did not, he was not ever able to come back and do the full-duty work that he had been doing for them before. That's why I asked opposing counsel. The offer was for six hours a day and not eight hours a day? Well, no, again, they offered the full eight hours. But the point is he was actually only doing six hours' worth of work. So they offered him eight hours' pay for six hours' work. Is that the idea? That's correct. And our point on that is, is that really a legitimate job offer? I mean, is the employer for this, you know, employee's life expectancy going to offer somebody that's only doing three-quarters' worth of the work, full-duty pay? The case that I quoted in the brief, Reliance Elevator, you're not supposed to be able to have sham jobs, how that was looked at, because it allows the employer the ability to defeat the purpose of the wage impairment. Again, we can kind of use common sense, Your Honors, I think on this. Again, you look at the 25-pound restriction on the left hand. This is a gentleman who was a carpenter. Twenty-five-pound restriction, can't be outside in the cold under 40 degrees. That's a 10-pound restriction on the right arm, can't lift overhead, and no repetitive use. And he's working six hours a day and gets paid for eight? For how long? Seems to be too good to be true? Is that what you're suggesting? If it seems to be too good to be true, it is. And that was the point. And the respondent, even though they made this offer, when he was going through this unrelated, technically in this case, issue of the other restrictions when he was getting less hours, and that's when he went to go find the other work, the employer did, as we know and the Arbitrator Commission noted, they encouraged him to go take this job, even though it paid half the amount of money. They said, you know, this sounds like a good job, and Mr. Cardot said, yeah, even gave Chuck a great reference. You know, it wasn't like they were begging him to come back to begin with. So on those basis, we do think, when you're looking at it on a manifest weight standard, that the Commission should be upheld. Just briefly on the right shoulder, hopefully I can help clarify this a little bit. I don't know if we're reviewing different records, and I mean no disrespect to my pleasant counsel, but there was not four neutral opinions in this case. There were five potential doctors that gave opinions. The only neutral opinion was their first IME, Dr. Sagerman. All four other doctors, Watt, Kiesler, Dr. Eilers, and their IME, Dr. Tonino, which is a point that wasn't brought up to begin with, that was their IME, that affirmatively linked it up. They all linked it up one way or the other. They didn't say that they couldn't determine causation. What they weren't exactly sure on and couldn't get agreement on is how it happened. Dr. Watt thought that it was related, but in his opinion it was because his arm was in a supine position when he was in the hospital. Dr. Eilers said the same thing and gave a firm causative opinion. Dr. Kiesler said this is related, end of quote, in a sense, but the ideology is unknown in the sense that it could be the jerking motion or some other thing, but I do think this is related one way or the other because he didn't have this problem before. And again, their own IME, Dr. Tonino, considered it to be related. So I respectfully, as your count or your honors pointed out, don't think the opposite result is clearly apparent. So based on all of those issues, we respectfully request that this Court uphold the findings of the arbitrator, the commission, and the circuit court. Thank you. Rebuttal, please. I just have a few points in rebuttal. First thing, counsel states that Dr. Tonino put an additional restriction on Mr. Jagey. However, Dr. Tonino was an expert. He wasn't his treater. His treater stated in deposition that he gave him no additional restrictions. He only had the restrictions of the 25-pound lifting with the left hand and the 40-degree weather, and that was it. That's number one. Number two, as I said before, there's no loss in earning capacity here. Counsel states, is there another company that would take him? They're asking this Court to surmise. Would there be another company that would possibly take him? However, where is the evidence that there's no other company that would take him? There was no other evidence. There's no evidence of a job search, as there are as there is in both cases that were stated in the briefs, the Gallianetti case and the Reliance elevator case. This is not a sham job, as it might have been perceived in Reliance, where he was offered a job a month after the arbitration hearing. This was a job that was offered to him pretty much right after he left, right after he was given these additional restrictions. They were taken off, and he was offered another job. Well, then provide us with a logical reason why an employer would offer somebody wages for eight hours a day if they worked only six. Well, there's – that is the indication as to what he was working prior to leaving. But that isn't to say that going forward that was how it would be and that he would – I mean, it's surmising. They basically gave him a job, a full-time job. Working only six hours. Well, that's not what was stated. That was not what was offered to him. He may – that might have been the history in the couple of months prior to him leaving, but – But was it in his usual and customary line of employment? He was offered a carpentry job at carpentry wages. But he was a journeyman carpenter for the – Yes. And he was offered a trim carpentry job, which Jeffrey Cardot, who was the general superintendent at ALCA, stated is paid at the same rate as a journeyman carpenter. And the other thing is that there was no evidence – nothing that was put into evidence stating what a, you know, a restrictive carpenter would make. The only evidence as to what a restrictive carpenter could make is this one job that he had. But he didn't state that he looked for a number of other jobs and this was the best-paying job he could find. And the Vogue expert didn't even – actually admitted at trial that he had not done any additional research as to what a restrictive carpenter makes. So, therefore, how can we possibly state that a restrictive carpenter, if that's what we're going to label him as, is unable to make as much as a full journeyman, especially when Jeffrey Cardot stated or testified to the fact that a trim carpenter is making the same at ALCA? I have nothing further. Thank you. The question I have, though, are all the trim carpenters at ALCA producing eight hours a day? I don't know whether or not that was admitted at trial. Thank you, counsel. The court will take the matter under advisory for disposition.